Good afternoon, Your Honors. May it please the Court, my name is Edward Chung. I'm serving as counsel. I think we're still in the morning. I think it's still good morning. Oh, good morning, Your Honor. There we go. Good morning, Your Honor. May it please the Court, my name is Edward Chung. I'm serving as counsel on behalf of the appellant Gregoria Marquez. I'd like to reserve five minutes for rebuttal. Okay, good. Keep your eye on the clock. It counts down. Thank you, Your Honors. As you know, this is an appeal regarding a discrimination, a whistleblowing, a negligent investigation, and a 42 U.S.C. 1983 claim that was granted summary judgment in favor of the respondent in the district court. The standard for review, as the Court is very well aware of, is a de novo review in review of these motions for summary judgments. In consideration of all the evidence that has been placed on the record, we believe that the evidence clearly shows where there was discrimination, where there was a basis for wrongful termination of Ms. Marquez, and basically that in hindsight, taking a look at her whole time that she was at Harborview, which is 43 years she was an employee of Harborview Medical Center, she dedicated herself to her job. And around 2007, she became a patient service specialist, too. And then in 2011, that's when she went ahead and made a complaint regarding possible misappropriations of time in relation to some of her fellow employees. When she brought this to her supervisor, Ms. Laura Newcomb, she basically denied that any such activity actually occurred. Thereafter, this is when Ms. Marquez started to notice some sort of treatment being treated differently. The record indicates that she was told that she should retire a number of times. So are you bringing an age discrimination claim? Yes, that's correct, Your Honor. Pursuing that? Yes, Your Honor. And basically, there's enough evidence from the record, especially in the discrimination case, for the court to make a reasonable inference. And I really focus on the word inference here because the evidence that we have really shows that there is a continuous pattern of conduct that Ms. Gregoria Marquez experienced while she was at Harborview Medical Center. Well, we're kind of really in the third, in the, I mean, if you make a prima facie case, then there's a lot of evidence in the record that she was being counseled and told not to confront other employees and things happen. So then we're really moving back to whether it's protectual, right? Yes. And the burden of persuasion there. Yes. In, all right, so you have the 2011 instance where she thought that someone was being, was improperly claiming overtime. And Ms. Newcomb said she couldn't substantiate that. But then your client pursued an audit, and I believe that the audit found some support for that, right? That's correct, Your Honor. Okay. And then there's also a 2013 complaint against Ms. Newcomb, which was investigated by Mr. Payne, correct? That's correct, Your Honor. All right. That occurred in, if I'm getting the timeline correctly, that occurred after they had already started calling her in about don't confront people. That's correct, Your Honor. And then it occurred, I think it was, they started calling her in maybe in March, then that was in June, and then it was decided in December, and then she was terminated the following year. Yes, your timeline is accurate, Your Honor. Okay. So I'm wondering if that, all right, the first one clearly, I guess what I can tell from the record, your client was at least an average employee? Average to above employee. But there are some issues here because one of the witnesses in this particular case that provided testimony, Constance Smith, said that some of her evaluations were not even prepared by her. She signed off on it. But the evaluations itself were not signed by her. So to me, that creates a very genuine issue of material fact is who is signing off on these evaluations. Because if we're using How does that go? I'm assuming at this stage of the game that we expect and assume that she was a valued employee for 43 years. If anything, this strikes me as a very patient response. But I don't understand the real answer to what Judge Callahan is talking about, which is, and I have the same question, aren't we in pretext land? You have to show pretext? Yes. Because there's a legitimate non-discriminatory reason here, right? She had been counseled not to approach these employees this way. And I just want to give you every fair opportunity to respond because I'm in the very same spot where I think we're really just talking about pretext here. Thank you for directing me in that direction, Your Honor. Basically, yes, you're correct, Your Honor. But that policy, which Ms. Newcomb had basically drafted, was not a Washington State University policy. And actually, if you take a look at the policy, it actually says she's expected to do, not to be involved with these other employees during the course of this investigation. And it may lead to her termination. So why does it matter whether that's an official policy or not? Is it your contention that it was ginned up for your client and it was somehow improper? Yes. In the 43 years that Ms. Gregoria Marquez was employed there, she never came across this. Okay. So let's say for a minute that it was ginned up in the course of this investigation. I don't mean pejoratively ginned up, but she's directed not to interact with the people that are involved in this conflict. What's wrong with that? What's wrong with that? Well, first thing, she doesn't even know who these people are. But so she's calling people, she's showing up at someone's house, she's trying to get to the bottom of who the snitches are. Correct. Basically. Correct. And they tell her, stay out of it. Just don't do that. And she doesn't. Well, that even raises an issue whether that is actually accurate because a number of these employees that she's worked with, she's worked with for a number of years, she's gone over to their house. It's reasonable for an employee to go to another employee's house and make discussions, especially if she didn't know initially that that employee. Okay. So I would agree with you after 43 years of what appears to be unquestioned decent employment, you know, whatever. If they came, the first time she confronted, I think it was Valdez or what, who's a friend to, a friend and a colleague, or there's some kind of a friend enemy or whatever. I don't know what we want to call her. But anyway, the first time, if they had fired her the first time she did that, I don't think anyone would disagree with you. That would seem to be unfair. But they called her in and said, don't do that. And then she keeps, and they didn't, and then how many times did they call her in and say, don't do that before she finally got fired? Well, yeah, they told her not to do that. Could you answer Judge Callahan's question? How many times was it? Was it three? I think it was two times, but it might have been three times. Okay, well, I'll have it in my notes. Go ahead. Forgive me. Okay. So basically the answer to your question is if you actually take a look at the deposition testimony that took place here, and we actually asked Ms. Valdez about the communications that she had with Ms. Marquez, she testified that she never felt that there was any retaliation being brought against her. But the thing is if your employer says, hey, don't contact people about what we're doing here, and then you continue to do it, I think what we're trying to say is, and we haven't talked about this, but what I'm hearing is they gave some reasons here. So now you go to pretext. You know, they shifted it. I think you're going to have a hard time saying that that didn't give some reasons, because your client even admitted to doing some of the contacts after she was told not to. But how far does that arm reach in terms of management in the workplace? Does it go all the way outside the workplace? So are you basically saying that they didn't give a legitimate business reason? I don't believe they did, no. And especially if this is a policy that's not, I mean, this is a letter that's basically drafted by someone who disagreed with her in the past, and she's reported for, you know, misconduct or not, you know, actually managing the way she should have managed. That creates a reasonable inference here that there's something beyond what's going here, than what we see. So are you talking, is that for pretext, or is that, has the burden shifted? Did they give a legitimate business reason, and then you're talking, are you talking that for pretext, or where are you talking that for? In order for them to give a legitimate business reason, we have to take a look at the language of the letter that Ms. Newcomb gave to Ms. Gregoria Marquez. And, you know, basically we have to also ask ourselves, where does she get the authority or rights to be able to make this type of statement that she's not allowed to communicate regarding an investigation? It's almost equivalent to not being able to defend yourself or investigate a claim. It's pretty common that when they do internal investigations, that people are told don't go out and harass people, you know, because then people start saying, well, I don't want to talk to you because so and so showed up. I mean, one of the gals, Valdez or whatever, called and said she's outside my house. What do I do, right? Yes, but, I mean, that's a little, that raises an issue of material fact, too, because they've been friends for such a long time. But there are several employees who complained. And from the management's perspective, they had other employees complaining, even saying that they were frightened. What's management supposed to do? They told you to stay away. And so I share Judge Callahan's concern. I want to give you an opportunity to make sure that my notes are right, if I could. I think they talked to your client and counseled her on March 15, 2013. And again on March 29, 2013. And again on January 23, 2014. That's correct. So that's three times. And then the final counseling session was March 17, 2014. But at that occasion, then that followed up immediately with a notice of intent to terminate. So it was really, I think, three times they called her in and said, please don't do this. Don't do this. But the evidence that you're relying upon here is evidence put forth by the respondent in a motion for summary judgment. All these people are not just interested parties. They're employees. But you don't contest that she was counseled three times not to do this, do you? Yes.  No, I didn't. And it didn't happen? The facts state that. Yeah, okay. So the fact of that is not challenged. But the question is, especially employment discrimination cases, is if we have really disinterested parties providing testimony on behalf of the respondent here. These people, you know, they're coming into, I mean, there's an investigation taking place. I suspect that these people have their interests of their jobs. Well, your best argument, in my view, would be that she was a good employee for 43 years. Then she called to the attention of her supervisor, something being amiss. The supervisor didn't agree with her. She went further, and then the audit proved her right. And so she pestoed off her supervisor, basically, because then the supervisor was in charge of paying overtime or something like that. So her problems, your best argument is that that's where the problem started, and then that's why it's protectural that everything else that happened. In addition to that, Your Honor, she did make another complaint in 2013. She did. Against there. Against Newcomb. And thereafter she was terminated. So, you know, we look at motions for summary judgment. We have to take light and most favorable to the non-moving party. Employment discrimination cases, this is even more. It's very difficult in any discrimination case to actually show that there is intent to discriminate. And that's why that standard is a little bit more lenient in these type of cases. And I believe that if you take a look at the totality of the circumstances here, there's just too much evidence that I think a reasonable jury could take a look at this and say, well, something's amiss here. Something is not just right. Can I interrupt you and ask? What's your strongest contention for pretext? What's the strongest argument for pretext? They have a legitimate non-discriminatory reason because they counseled her three times and they had employee complaints and she contended to pester people. So what's the strongest pretext argument? Well, the letter itself, we believe, is not a basis for them to be able to terminate her. And it was just vague. And in addition to that, she should be able to have the right during an investigation to still be able to communicate with her fellow employees or talk with them or have communications with them. And if you're telling someone that they can't speak about it, can't talk about it, you know, she doesn't have any ---- What's your best case that when they have an ongoing investigation and they cite a policy and say, don't talk to the people involved until we're done with it, what's your best case that says that that's just a flat-out violation? Well, because, again, that's not a policy. It was something that was just created. I mean, there's a ---- this is an agency. If there's an administrative agency that has certain rules and they acknowledge that they have certain rules and administrative rules, there's no rule here that this actually exists. This is something that is based on the very person that she reported and then thereafter reported again and thereafter she was terminated. Well, but your client's trying to get to the bottom of who's snitching her off about contacting. You know, are you the one that called or, you know, that's the ---- she's trying to get to the bottom and they're just saying, knock it off, just let the investigation run its course. Is she or is she really just trying to have a communications with, you know, someone has made a statement. I mean, there was an investigation that she had time cards in her car and found out that she never actually did. And so it's reasonable for her to start seeing something like, are they targeting me, is something going on here, or is this just this Laura Newcomb lady who's just going to keep on going after me time and time again. And we put forth that that's specifically what it is because if you take a look at the 2011 complaint, 2013 complaint, and then termination, there's just too much there that we believe that ---- the pretext argument, we think it has to do with that letter that she received in relation to who she was able to communicate with. And I think that she has a right to be able to look into allegations that have been made about her, especially since allegations in the past have been found to be false. Okay. Now, we've taken you down to about eight seconds. We'll make sure you get enough time in rebuttal, however. Thank you. Thank you. Good morning. May it please the Court. Howard Goodfriend for the Appellee Harborview Medical Center. The district court properly granted summary judgment here because the reasons for Ms. Marquez's dismissal were objective, they were documented in emails, and they were admitted as true by Ms. Marquez in interviews. Well, I agree with you that you get past giving a legitimate business. But I'm going to say I have trouble ---- I'm pondering over when we get to pretext, it's a burden of persuasion, and we basically have to conclude that no reasonable juror would find that. That's what the district court did. So she does have going for 43 years of no problems, basically. I mean, it's, you know, I mean, she's not a problem. No. 43 years. She makes a complaint about saying I think someone was overpaid, and it appears that Newcomb either shined her on, couldn't substantiate it or whatever. She goes further. The audit shows that Newcomb was wrong, and you can infer from, a reasonable person could infer from that that you're not very happy about, I mean, she didn't stop with what Newcomb said to her. She went further, and then Newcomb probably got in a little bit of trouble because she did, that employee was overpaid. There was some sort of problem. And then you have another complaint later that Newcomb, that she complained about Newcomb, and they found that they couldn't, didn't substantiate that. And so her life suddenly goes all downhill. The time frame is such that the time frame works for her. So ---- Well, let me address that. And the fact that she was not a problem before. I don't think the time frame works for her, Your Honor, and the reason is this. The incident in 2011 is, I think as you portrayed it, she was in fact found to be correct. The employee at issue was misusing overtime and was forced to repay that overtime. So Ms. Marquez was in fact correct in 2011. Right. And her supervisor doesn't usually like that. Well, there's really no evidence of anything that occurred adverse to Ms. Marquez from 2011 until 2013. 2013, Ms. Newcomb learns that there's an allegation that Ms. Marquez has protected employee information in her car. She brings Ms. Marquez in to interview her. And what does she say? She says, I believe you, in fact. And I found no evidence to support this. And she gives her a policy statement that says, and this is a university policy. It's in the ERs. It's at SER 48. It's policy 46.3 that says don't retaliate against people. And in consultation with HR, while they're investigating this, she's told don't contact people, don't harass them. Standard language given to her from HR by Nora Balch. Can I ask a question right there? Yes. Is that the March 15th meeting? Yes. The meeting occurred on March 15th. The letter was given to her in advance of the meeting on March 8th. So that's a meeting with Marquez, her union representative, and Newcomb and Balch. Correct. Okay. Yes. The letter that's given to her is in advance of that meeting saying, during this week before, don't harass people. But what does she learn? What does Ms. Newcomb learn thereafter? In fact, she has harassed people. And this is not something that's made up. It's admitted. It's not contested. And there are emails from the employees feeling uncomfortable about this questioning from Ms. Valdez. On March 16th, the next day, swear on your mother's grave that you did not make the complaint. Correct. Shaking in fear. Correct. She admits that she called Maria Gonzaga and asked her if she was the one who said she had these in a car. She admits that she confronted Teresa Valdez and said, you turned me into Laura. And she admits that this occurs. Again, on March 21st, another incident occurs. She confronts Valdez in the pantry. Gonzaga emails Newcomb on March 22nd to complaints. There's another meeting with her with Marquez on March 29th. She's again counseled, but she admits these actions occurred. Excuse me. That meeting on March 29th, it's Newcomb, Baltz, Marquez and her union representative again. The same four people? Yes, correct. Okay. Thank you. At which Marquez admits trying to find out who told on her. She admits confronting Valdez in the pantry. And she admits calling Gonzaga at home, as Gonzaga put in an email. May 8th, notice of final counseling. Again, she's, don't do this. Thereafter, she calls Laura Vo, another employee, to find out who was talking about her to management. And then on May 14th, there's the final counseling session with Baltz, Newcomb, Marquez. She's given a lengthy list of how she violated the prior counseling. And again, with an action plan telling her, don't confront other employees. So really, if you're talking about the March, the 2011 incident. And after that, that's when she complains about Newcomb. In June, yes. After she's given the notice of final counseling is her complaint. So that complaint in June 2013 cannot be a cause of the final counseling. Absolutely, it can't. Why not? Because the final counseling occurred a month earlier in May. And? And her complaint is, and Marquez's complaint is made in June of 2014. But she doesn't get fired until the next year. But she doesn't get fired until the next year. So it could be considered for why she got fired. It could be, perhaps. Well, it happened before she got fired. It did. So I'm with you on. It did happen before she got fired. It didn't happen before she was being counseled. But what happens thereafter? Again, she admits, I mean, we have the e-mail from Baldez, who tells her that she's seeking information about Padilla, Gunzag, and NUCCA and making her uncomfortable. Marquez admits going to Laura Vaux's home thereafter, calling Gunzag a spy. So these things all occurred. And they're documented. She's then put on paid administrative leave in February 25, 2014. And that evening, Marquez shows up at Baldez's house and is waiting there when Baldez comes home. Again, there's an e-mail reporting this. She admits that this happens. And Baldez reports that she's getting daily phone calls from Ms. Marquez and that she's scared of her. And at that point, there's another meeting at which Baldez, I'm sorry, at which Ms. Marquez tells NUCCA, quote, if I go down, they all go down too. That's the March 17th meeting. Yes, that's correct. Okay. And at that point, on March 20th, there's a recommendation of dismissal. So were the age things happen? Were the comments about who's going to retire or it would be better if she retired or where did those factor in? Well, what the district court found, and I believe it's true, if you look at the deposition of Constance Smith, there's another employee who basically said, I heard things. I heard that she was, well, there's. Well, what are the statements that are in the record? The statements that are in the record are. Because we have to consider. The only statements that are in the record are that NUCCA mentioned retirement to her in 2005 when she became her supervisor. And NUCCA says she was assessing staffing and just trying to determine what the unit's needs were. That's 10 years before. Isn't there some comment somewhere, though it might be disputed, but for these purposes that it would be better if she retired and when was that? And we don't know. We don't know whether that occurred, you know, during this entire, after she had received final counseling or after she was placed on paid administrative leave. Okay, but it wasn't in 2005. No. That wasn't in 2005. We don't know when it happened. And we don't know who made them. We don't know when they occurred. They're based upon the deposition testimony of Constance Smith, which is in about ER 156 or so. And she admits, as the district court said in his order, that when questioned, she said she couldn't relate negative comments about Ms. Marquez to her age. This may not be directly relevant to the legal question in front of us, but I do have to ask, is there a difference in terms of retirement benefits for Ms. Marquez depending on whether she voluntarily retired or whether she was terminated? I'm not sure because it's not in the record, but my understanding is that her benefits were vested as a PERS 1 employee based upon her years of service, and that they could not be forfeited as a result of the status, the reason why she left employment. Counsel, I didn't mean to interrupt you. Go ahead. Were you done with answering Judge Fletcher's question? Yes. I apologize. Just following up on your answer to Judge Callahan's question, I think Marquez alleges at SCR 2226 that Newcomb said it around 2011, suggested that she should retire, not just back in 2005. Isn't that right? That's the allegation, I think. I'll have to look at that site, but that's possible. That's possible. I was referring to the deposition testimony of Ms. Smith, who was unable to put any dates on any of the statements, or, for that matter, identify with specificity anyone who said anything about her age. I think Marquez has made the allegation, though. That's my only point. That's quite possible. Okay. But the point is, as I think the district court rightfully determined, that action, either protected action or an age-related statement occurring in 2011, really has a very, such slim causal connection to adverse employment action occurring two and a half or three years later that is based upon specific documented and admitted facts of wrongdoing. That no reasonable, rational fact finder could find that it was a substantial factor in her termination. The fact of the matter is, there are many, many people over the age of 40 in Ms. Marquez's age bracket working in that unit. She was unable to show any... You weren't going to say 40 is elderly. I was going to say that if you're over 40 and adverse employment action occurs to any of us, we have, you know, established at least a prima facie claim that adverse employment action is taken to us because we're in a protected class. That's my point. Right. It's not disputed, at least at summary judgment, that some comments were made that perhaps she should retire. She's got that in the record, right? She does. Yeah. But we don't know when, and we know that the only one that's at issue was made two years before this happened. But you're relying on attenuation. We are. We are. And, you know, I know that the lapse of time is not sufficient, and that's particularly perhaps more true in retaliation cases, because we know people can lie in wait and then pounce. That's possible. But in age discrimination cases, I think, you know, to show animus continuing for two and a half years, you need something more than a simple statement about retirement two years earlier. And, you know, the cases, I think, are of... When was it established that Ms. Marquez was right in, I think her claim is that she, her theory is that she showed up her supervisor, that in the end she was right about the initial... But nothing happens to her for two years. So my question is, when was it established that she was right? We don't have the date that that occurred, but we know... Estimate? It was sometime in 2011. Okay. Yes. I think there are allegations that she made in 2007 and then again in 2011, and I think that one, the 2011 one was resolved that year. So really, you know, in the absence of any adverse action taken to an employee over a two-year period, it's very, very, very difficult to make any sort of causal link between the one and the other. I've got a... It's almost an intellectual or abstract question, but it's bothering me. I think we are at the stage of pretext. I mean, there's a legitimate business reason, given her continuing and repeated violations of what she'd been told to do. Then the question is pretext. Well, there are two reasons why it could be pretext. One of them, as suggested by Judge Callahan, seems to me at least plausible, that Newcomb has it out for her because she's been shown up. And as you said, it does not have to be closely proximate in time. You could lay in wait. I mean, I don't know whether you read my opinion in Coe's Altar, which... It makes that very, very point. Well, it may well be pretext, and that Newcomb was laying in wait and finally got a chance to get her. But this is going to be a complicated question, and I'm struggling with it. And it's pretext. Well, if it is pretextual, does that make it go away for purposes of age discrimination? Well... That is to say, this is not the real reason it happened. So that's gone as a reason. And now what we have is that reason doesn't apply. They've got no reason to fire her, and we have in the record all this talk about retirement. Well, to start with the first aspect of your question, if I may eat up and know a little of my time, I think I will. If it were retaliatory, and this is, I think, why Judge Martinez found no reasonable fact finder could find discrimination in this case. Were it reasonable to assume that she was laying in wait for a reason? She would have done a lot more with this protected information in the car allegation than dismiss it and say, I believe you. And it's undisputed that she did. She said, I believe you. There's nothing here. Go on, but just don't harass people. And the only reason, the only reason she was called back in was because other people came and complained to her. What's an employer to do in that situation? So as to that point, Your Honor, I think in this situation, there is no causal connection for retaliation. As for age discrimination, I would agree 100%. That astray remark and, you know, there are other cases. I'm sure you're agreeing with me. What I was saying is if you take away this reason and call it pretextual, what we have is talk about retirement and then firing. Well, but you have talk about the only statement about retirement that anybody, and it's Ms. Marquez, I guess, who made it, is in 2011. And nothing happens for over two years after that? I got it. No reasonable fact finder could find that this was pretext on this set of facts. Okay. Thank you very much. Could you put three minutes on the clock, please? Your Honors, on the issue that we have to take a look at here is was there retaliation? Was there harassment? Was that the basis for which Ms. Marquez was dismissed? Specifically, we know deposition testimony says contrary to what Ms. Newcomb represented on the record, that she, that Teresa Valdez claimed that she felt that she was being harassed. Deposition testimony shows completely opposite to that information. What deposition testimony? For Teresa Valdez. Teresa Valdez asked, you know, did you in any way feel that you were being retaliated against? And she specifically said no. So right here, we have. That really doesn't matter because it's a question of if your employer can tell you don't do this and you continue to do that, it doesn't really, her state of mind to me doesn't really matter. Perhaps. But the issue here is, you know, she's able to have conversations. And so why are they still contacting the employer and saying I've got, you know, I mean, obviously down the line, and, you know, and that's probably more evidence of the exact reasons that you don't want people contacting people and pushing them around so that they change their stories all the time is, but it's undisputed that during the period of time before they took action against her, that they kept contacting the employer saying, you know, she's calling me, she's calling me, she's calling me, you know. Well, that was a concerning issue when I asked Ms. Newcomb about these e-mails that she was receiving complaints of. And then when we did the deposition testimony of, you know, Ms. Valdez, she said that this is not true, these are not accurate statements. But what about Gonzaga? So March 15th, the first time she was counseled, the very next day she contacted Maria Gonzaga, right, who denied it and then denied being the informant. And then your client apparently responded, it's Teresa Valdez then, and then went to her the next day, swear on your mother's grave, and you've just reminded me that's right. Her deposition testimony is then that she wasn't concerned. But what about Gonzaga? Well, I mean, the problem that I have, at least if you have one domino, then the rest of the dominoes fall down, is I can't, that is a credibility issue that I believe that should be presented to a jury. I think it is. If the employer gets a complaint from Gonzaga saying this person's contacting me and she's scaring me, what's the employer supposed to do? She's told her to stay away. We know that she allegedly received a complaint from Teresa Valdez as well, and we know that Teresa Valdez claimed that that email and that complaint wasn't accurate. Except your client doesn't, and then I'm going to stop, but I don't think your client raises a materialistic fact about having approached Gonzaga, right? She doesn't deny that she did this. No, she does not. Okay. No, and one of the other things that I would say is that policy itself, there is a Washington State policy, and that's my whole point here is that you're not to retaliate, harass, or get involved in this type of activity, but the concern here is she's kind of terminated really in relation to this letter that Laura Newcomb presented to her, not really that policy. And that policy, they haven't really established, was there retaliation or harassment in relation to this. Even if you consider those letters, whether she felt fearful or not, that even raises a question as to whether she actually did harass or this amounts to retaliation by a prior effect. We're now taking you over time. Could you just sum up? Yes. In light of this information, Your Honor, we're going to ask that the court remand this back to the district court and for a trial. Thank you, Your Honor. Okay. Thank both sides for their helpful arguments. The case of Marquez v. Harborview Medical Center submitted.
judges: W. Fletcher, Callahan, Christen